## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| JULIET R. COTTON, | § | |
|     Petitioner, | § | |
| | § | |
| VS. | § | Civil Action No. 4:10-CV-545-Y |
| | § | |
| JOE KEFFER, WARDEN, | § | |
| FMC-CARSWELL, | § | |
|     Respondent. | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE
## AND NOTICE AND ORDER

This cause of action was referred to the United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b), as implemented by an order of the United States District Court for the Northern District of Texas. The Findings, Conclusions, and Recommendation of the United States Magistrate Judge are as follows:

### I. FINDINGS AND CONCLUSIONS

#### A. NATURE OF THE CASE

This is a petition for writ of habeas corpus by a federal prisoner pursuant to 28 U.S.C. § 2241.

#### B. PARTIES

Petitioner Juliet R. Cotton, Reg. No. 53034-019, is a federal prisoner incarcerated in FMC-Carswell in Fort Worth, Texas.

Respondent Joe Keffer is Warden of FMC-Carswell.

## C. PROCEDURAL HISTORY

In 2001 Cotton was charged in a 35-count indictment with bank fraud and other offenses related to a scheme to defraud the SouthTrust Bank of Alabama (STB) of millions of dollars, which she converted to her personal benefit, in the United States District Court for the Northern District of Georgia, Atlanta Division. (Resp't App. at 21-32) The factual background of the case was stated by that court in its Order and Opinion issued in petitioner's § 2255 action as follows:

> SouthTrust Bank, a federally-insured financial institution, made two loans totaling more than $18.0 million available to Quality Grain Company (Ghana) Ltd., a corporation organized under the laws of the Republic of Ghana ("QGC (Ghana)"), to finance the purchase of equipment and services to build a commercial rice mill in the Republic of Ghana, West Africa. At all relevant times, Movant, then known as "Juliet R. Woodard," was president of QGC (Ghana). Movant was also president of Quality Grain Company, Inc., a corporation organized under the laws of the State of Tennessee ("QGC, Inc.")

> On November 13, 1996, SouthTrust Bank made approximately $6.0 million available to QGC (Ghana) to purchase equipment for the Ghana project, which was insured by the Ex-Im Bank and guaranteed by the government of Ghana (hereinafter "Ex-Im loan"). On November 27, 1996, SouthTrust Bank issued a letter of credit under the Ex-Im loan, for the benefit of "Agri-Tech," in the amount of $3,372,680.95, on the application of borrower, QGC (Ghana). The letter of credit required that a signed invoice, marked "accepted" by QGC (Ghana), and an exporter's certificate accompany each request for payment under the letter of credit.

> As part of SouthTrust Bank's approval of the Ex-Im loan, Movant represented that James McGarrh, a sole proprietor, d/b/a "Agri-Tech," would supply management and technical services and technology transfer to QGC (Ghana), as a non-affiliated supplier to borrower, under an agreement dated November 7, 1996, that Movant executed on behalf of the borrower, QGC (Ghana). SouthTrust Bank required this arrangement because it would not permit Movant, as she had intended, to sign both as a borrower and as a seller to borrower. Consequently, pursuant to the November 7, 1996, agreement, QGC (Ghana) agreed to pay Agri-Tech, $3,372,680.95 for providing specified services and technology transfer for a period of three years to ensure that the project maintained "world class standards" for a commercial rice farm and rice processing mill.

> Beginning on November 26, 1996, Movant "accepted" "Agri-Tech" invoices on behalf of borrower that were submitted to SouthTrust Bank for payment that

represented that "Agri-Tech" was due $3,516,865.61 (less the 15% cash down payment that he received) from borrower for services specified in the invoices. Mr. McGarrh, d/b/a "Agri-Tech," however, did not provide the borrower, QGC (Ghana), those services under the November 7, 1996, agreement that were specified in the "Agri-Tech" invoices that were submitted to the bank for payment. All of the "Agri-Tech" invoices that were submitted to SouthTrust Bank for payment under the Ex-Im loan were false.

The idea of using "Agri-Tech" as a non-affiliated supplier to the borrower, QGC (Ghana) was Movant's device to obtain commissions on the equipment that would be sold to QGC (Ghana) for the rice project and would be paid for with proceeds of the SouthTrust Bank loan. According to Mr. McGarrh, Movant told him, "Jim, I want you to go down and get a license so that we can start buying the equipment for this project, cause somebody is going to make a commission off of the equipment that is sold and it might as well be us." Mr. McGarrh responded by asking, "What would you like to call it then?" Movant replied, "Well, just call it Agri-Tech." Mr. McGarrh estimated that there would be, "a million dollars worth of commissions," for equipment that was to be purchased by QGC (Ghana) for the project, which was to be divided among Movant, Mr. McGarrh, and Movant's uncle, Oscar Hudson.

After Mr. McGarrh obtained the "Agri-Tech," d/b/a/ license, he met Movant in Atlanta, Georgia. Movant asked Mr. McGarrh "to sign documents to get money from SouthTrust Bank." Movant said, "If you will sign these papers, I can take it from there and it will be convenient for me and a lot less trouble for you." Mr. McGarrh signed the "papers," which included blank "Agri-Tech" invoices, as Movant requested. On November 25, 1996, Mr. McGarrh opened a "d/b/a Agri-Tech" account at First Tennessee Bank in Cordova, Tennessee, with an opening balance of $10.00. "Agri-Tech" was a bank account of Movant and QGC, Inc.

On November 27, 1996, SouthTrust Bank wire transferred $1,954,389.00 of Ex-Im loan proceeds to "Agri-Tech" at First Tennessee Bank in payment of a false "Agri-Tech" invoice dated November 26, 1996, for $2,299,281.40, that was "accepted" by Movant on behalf of borrower. That same day, Movant directed Mr. McGarrh to transfer $1,953,389.00 from "Agri-Tech" to QGC, Inc. Mr. McGarrh did not know either that the $1,954,389.00 wire transfer was in the "Agri-Tech" account or the identity of the account into which the money was transferred. Mr. McGarrh knew only that the money wound up with Movant.

After the "Agri-Tech" funds were transferred to QGC, Inc., Movant engaged in monetary transactions in the criminally-derived property–namely, the $1,953,389.00 of Ex-Im loan proceeds that had been taken from SouthTrust Bank by the false "Agri-Tech" invoice. On December 1, 1996, Movant transferred three

checks drawn on her QGC, Inc. account at First Tennessee Bank, totaling $122,000.00, to Gospel Tabernacle Church, in Atlanta, Georgia.

On November 8, 1996, Movant agreed to purchase a residence in Duluth, Georgia, for $1,100,000.00, to close on November 29, 1996. As part of the purchase agreement, the parties stipulated that Movant's application for a mortgage loan would not be made until after November 26, 1996. On November 29, 1996, a First Tennessee Bank response to a request from Movant's mortgage company for verification of deposit for account number 200730602, for Juliet R. Woodard, showed that there was a balance in the account (the corporate account of QGC, Inc.) of $1,954,216.56, as of November 29, 1996.

On November 29, 1996, Movant opened a personal account at Wachovia Bank in Atlanta, Georgia, with an initial deposit of $500.00. On December 2, 1996, First Tennessee Bank made a wire funds transfer of $650,000.00 of "Agri-Tech" funds from QGC, Inc.'s corporate account to defendant's personal account at Wachovia Bank. On December 10, 1996, Movant withdrew $540,000.00 from her Wachovia Bank personal account, and Movant delivered a Wachovia check for $540,000.00 to the closing attorney to pay cash due at the closing of the purchase of the residence.

The credit insurance policy that Ex-Im Bank issued to SouthTrust Bank covering the Ex-Im loan required borrower, QGC (Ghana), to make payments to suppliers in cash equal to $1,050,000.00. On December 4, 1996, Movant opened a corporate account for QGC, Inc., at SouthTrust Bank, in Atlanta, Georgia. On December 5, 1996, First Tennessee Bank wire transferred $1,050,000.00 of "Agri-Tech" funds from the QGC, Inc. Corporate account at First Tennessee Bank to Movant's new QGC, Inc. corporate account at SouthTrust Bank. On December 10, 1996, at Movant's direction, SouthTrust Bank made an intra-bank transfer of $1,050,000.00 from the QBC, Inc. corporate account to an "escrow account," to satisfy the $1,050,000.00 cash down payment that QGC (Ghana) was required by Ex-Im Bank to make to suppliers.

Exporter's certificates, which were required by Ex-Im Bank to be submitted to SouthTrust Bank, certified that "Agri-Tech" received cash payments from QGC (Ghana) totaling $544,000.00 for services described in the false "Agri-Tech" invoices. Mr. McGarrh, d/b/a "Agri-Tech," however, did not receive cash payments from QGC (Ghana) for services rendered. In total, SouthTrust Bank disbursed $2,284,580.32 of the $6.0 million Ex-Im loan proceeds in reliance on the false "Agri-Tech" invoices "accepted" by Movant. All of these loan proceeds ultimately went to Movant directly or to bank accounts that Movant controlled.

In July, 1997, SouthTrust Bank made a second loan available to QGC (Ghana) (sometimes referred to herein as the "Natwest Loan") in the amount of $12.0 million to purchase farm equipment and other purposes for operation of borrower's business in Ghana, which was guaranteed by the Republic of Ghana but not insured by Ex-Im Bank. In August, 1997, upon application of QGC (Ghana), SouthTrust Bank issued a letter of credit for $2,215,000.00 for the benefit of Agri-Tech under the second loan. The letter of credit required that an invoice accepted by QGC (Ghana) accompany each request for payment. SouthTrust Bank disbursed $2,215,000.00 of proceeds of the second loan to Movant and QGC, Inc., to pay a false "Agri-Tech" invoice that was "accepted" by Movant on behalf of the borrower, QGC (Ghana).

Movant engaged in the following monetary transactions on various dates in criminally-derived property in connection with the $2,215,000.00 proceeds from the second loan:

(1)     on August 8, 1997, SouthTrust Bank transferred $200,000.00 in cash proceeds of the second loan directly to Movant;

(2)     on August 8, 1997, Movant delivered $65,150.30 of United States currency to Tiffany & Company to purchase jewelry;

(3)     on August 11, 1997, Movant paid $30,000 in United States currency to a travel agent for arrangements for her wedding and honeymoon;

(4)     on August 26, 1997, Movant ordered a $50,000 wire transfer from the QGC, Inc. corporate account at SouthTrust Bank to her personal account at Wachovia Bank;

(5)     on August 26, 1997, Movant ordered a wire transfer of funds of $100,000 from the account of QGC, Inc. at SouthTrust Bank in Atlanta, Georgia, to the QGC, Inc. account at First Tennessee Bank, in Memphis, Tennessee;

(6)     on August 27, 1997, defendant [sic] ordered a wire transfer of funds for $79,000 from the QGC, Inc. account at SouthTrust Bank to her mother's account in Mississippi to purchase real estate; and

(7)     on August 27, 1997, Movant ordered a wire transfer of funds for $100,000.00 from QGC, Inc. account at SouthTrust Bank to her personal account at Wachovia Bank.

5

In September, 1997, Movant applied for a second letter of credit on behalf of QGC (Ghana) under the second loan for the benefit of "Agri-Tech," for $4,943,715.23. Additional loan proceeds totaling that amount were then paid out by SouthTrust Bank in reliance on two false "Agri-Tech" invoices "accepted" by Movant on behalf of QGC (Ghana). Movant conducted the following monetary transactions on various dates in criminally-derived property in connection with the $4,943,715.23 proceeds from the second loan:

(1) on October 17, 1997, Movant ordered a wire transfer of funds of $26,000.00 from the account of QGC, Inc. at SouthTrust Bank to her in-laws' account in Omaha, Nebraska;

(2) on October 17, 1997, Movant ordered a wire transfer of funds of $500,000.00 from the QGC, Inc. account at SouthTrust Bank to the account of QGC, Inc. at First Tennessee Bank;

(3) on November 13, 1997, SouthTrust Bank made a wire transfer of "Agri-Tech" funds of $3,281,831.00 to the First Tennessee Bank account of QGC, Inc.;

(4) on November 6, 1997, Movant transferred a check on the account of QGC, Inc. at First Tennessee Bank, for $59,598.35, to Troncalli Jaguar in order to purchase a Jaguar automobile; and

(5) on December 15, 1997, Movant wrote a $3,300,000.00 check payable to "Juliet Woodard" drawn on QGC, Inc. account at First Tennessee Bank, which she then deposited into her personal account at SunTrust Bank in Atlanta, Georgia.

In sum, SouthTrust Bank transferred $7,225,706.23 of proceeds of the second loan for Movant or QGC, Inc. for payment of three false "Agri-Tech" invoices that were accepted by Movant on behalf of borrower.

In June, 2001, SouthTrust Bank made a demand on the Republic of Ghana to pay the Ex-Im loan payment that was due March 15, 2001. Even though it was a guarantor of payment of the Ex-Im and Natwest loans to QGC (Ghana), the Republic of Ghana refused to comply with SouthTrust Bank's request to pay because, "the transaction that had already cost the government of Ghana $21,000,000, for very little value." Nevertheless, the Republic of Ghana paid SouthTrust Bank approximately $20,176,000.00 in principal and interest. QGC (Ghana) made no payments of principal or interest on either loan, except for the first payment on the first loan,

which was deducted from QGC, Inc. account at SouthTrust Bank from proceeds of the second loan, derived from false "Agri-Tech" invoices.

On July 13, 2001, SouthTrust Bank submitted a proof of loss to Ex-Im Bank claiming an insured loss of $2,061,527.59, based on "protracted payment default." With the proof of loss, SouthTrust Bank submitted to Ex-Im Bank false "Agri-Tech" invoices, related false exporter's certificates, and the November 7, 1996, management and technical services agreement, upon which the false "Agri-Tech" invoices and false exporter's certificates were based.

(Resp't App. to Mtn. to Dismiss at 21-32) (citations to the record omitted)

Following a jury trial, on June 17, 2002, the jury found Cotton guilty of two counts of bank fraud, in violation of 18 U.S.C. § 1344, nine counts of using a false writing and document, in violation of 18 U.S.C. § 1001, six counts of making false statements, in violation of 18 U.S.C. § 1014, and eighteen counts of engaging in monetary transactions in criminally-derived property (money laundering), in violation of 18 U.S.C. § 1957. (Resp't App. at 20) Cotton appealed her convictions and sought postconviction relief via 28 U.S.C. § 2255 and Rule 60(b), to no avail. *See United States v. Cotton*, PACER, U.S. Party/Case Index, Criminal Docket for # 1:01-CR-00760-CAP-LTW-1. Cotton filed this federal petition in this division, where she is currently serving her sentences. The government has filed a motion to dismiss the petition for lack of jurisdiction, in part, and to deny, in part.

D. ISSUES

Cotton raises five grounds for relief:

(1)     She is actually innocent of honest services bank fraud under 18 U.S.C. §§ 1344 and 1346 in light of the Supreme Court decision in *Skilling v. United States*, 130 S. Ct. 2896 (2010);

(2)     Her convictions for making false statements under 18 U.S.C. §§ 1001 and 1014 are inextricably intertwined with her invalid convictions for

7

bank fraud and must be vacated on grounds of "retroactive misjoinder" and taint;

(3)     Her convictions for money laundering under 18 U.S.C. § 1957 are inextricably intertwined with her invalid convictions for bank fraud and must be vacated on the grounds of "retroactive misjoinder" and taint;

(4)     She is actually innocent of money laundering under 18 U.S.C. § 1957 in light of the Supreme Court decision in *United States v. Santos*, 553 U.S. 507 (2008); and

(5)     Her total sentencing enhancements are intertwined with her invalid bank fraud convictions and must be vacated on grounds of "retroactive misjoinder" and taint from spillover from § 1344.

(Pet. at 5-6 & Supp.)

## E. DISCUSSION

Cotton claims the Supreme Court decisions in *Skilling v. United States*, 130 S. Ct. 2896 (2010), *Black v. United States*, 130 S. Ct. 2963 (2010), and *Weyhrauch v. United States,* 130 S. Ct. 2971 (2010), all of which involved the "honest services" fraud statute in 18 U.S.C. § 1346,[1] has rendered the conduct for which she was convicted, and other offenses predicated upon those offenses, non-criminal and the jury instructions instructing the jury on two alternative theories of bank fraud unconstitutional. (Pet'r Mem. at 1-14) Cotton also claims her money laundering convictions must be vacated in light of the Supreme Court decision in *United States v. Santos*, 553 U.S. 507 (2008), and her sentence recalculated. (Pet. at 5-6 & Supp.)

Typically, § 2241 is used to challenge the manner in which a sentence is executed. *See Warren v. Miles*, 230 F.3d 688, 694 (5th Cir. 2000). Section 2255, on the other hand, is the primary

---

[1]In the three cases cited by Cotton, the Supreme Court contemporaneously considered the issue of the constitutionality of the honest services fraud statute, with *Skilling* resulting in the Court's lead opinion.

means under which a federal prisoner may collaterally attack the legality of her conviction or sentence. *See Cox v. Warden, Fed. Det. Ctr.*, 911 F.2d 1111, 1113 (5th Cir. 1990). Section 2241 may be used by a federal prisoner to challenge the legality of her conviction or sentence only if she can satisfy the mandates of the so-called § 2255 "savings clause." *See Reyes-Requena v. United States*, 243 F.3d 893, 901 (5th Cir. 2001). Section 2255 provides that a prisoner may file a writ of habeas corpus if a remedy by § 2255 motion is "inadequate or ineffective to test the legality of his detention." *See* 28 U.S.C. § 2255. To establish that a § 2255 motion is inadequate or ineffective, the prisoner must show that: (1) the petition raises a claim that is based on a retroactively applicable Supreme Court decision, (2) the claim was previously foreclosed by circuit law at the time when it should have been raised in petitioner's trial, appeal or first motion for postconviction relief, and (3) that retroactively applicable decision establishes that the petitioner may have been convicted of a nonexistent offense. *Garland v. Roy*, 615 F.3d 391, 394 (5th Cir. 2010); *Reyes-Requena*, 243 F.3d at 904. The petitioner bears the burden of demonstrating that the § 2255 remedy is inadequate or ineffective. *Pack v. Yusuff*, 218 F.3d 448, 452 (5th Cir. 2000).

As to grounds one, two, three and five, Cotton has not provided any valid reason why the § 2255's remedy is either inadequate or ineffective. Cotton cannot rely on § 2241 to avoid procedural hurdles presented under § 2255, such as the one-year statute of limitations or the restriction on filing second or successive motions to vacate. *See Jeffers v. Chandler*, 253 F.3d 827, 830 (5th Cir. 2001) (holding that prior unsuccessful § 2255 motion or the inability to meet the statute's second or successive requirement does not make § 2255 inadequate or ineffective); *Pack,* 218 F.3d at 453 (citing *Toliver v. Dobre*, 211 F.3d 876, 878 (5th Cir. 2000) (holding that prior, unsuccessful § 2255 motion, the limitations bar, and successiveness do not render the § 2255 remedy inadequate or

ineffective). Even if *Skilling* were retroactive to cases on collateral review, which neither the Supreme Court nor the Fifth Circuit has held, Cotton cannot demonstrate that she was convicted of a nonexistent offense.[2] In *Skilling*, the Supreme Court held that 18 U.S.C. § 1346 criminalizes only bribery and kickback schemes, *i.e.,* fraudulently depriving another of one's honest services by accepting bribes or kickbacks. *Skilling,* 130 S. Ct. at 2933. Contrary to Cotton's assertion, she was not charged with honest services fraud under 18 U.S.C. § 1346–*i.e.,* a scheme to deprive another of the intangible right to honest services, in the underlying criminal indictment, the jury charge contained no instructions on honest services as an alternative theory, and Cotton was not convicted of honest services fraud under § 1346. (Resp't Mot. to Dismiss at 8; Resp't App., Court's Charge, at 3-19) *See United States v. Hoeffner*, 626 F.3d 857, 864-66 (5th Cir. 2010); *United States v. Anderson,* No. 3:10-CV-1550-B, 2010 WL 4623831, at *1-2 (N.D.Tex. Oct. 20, 2010). Thus, the Supreme Court's holding in *Skilling* is neither relevant nor applicable to her bank fraud convictions.

As to ground four, Cotton claims she is actually innocent of the money laundering offenses in light of the Supreme Court decision in *United States v. Santos*, 553 U.S. 507 (2008). The federal money laundering statute makes it a crime to conduct a "financial transaction" knowing that the property involved in the transaction represents the "proceeds" of some form of unlawful activity when the transaction in fact involves the proceeds of specified unlawful activity. 18 U.S.C. § 1956(a). In *Santos*, the Supreme Court considered the interaction between an illegal gambling operation and the meaning of "proceeds" under § 1956. In a divided opinion, the Supreme Court

---

[2]The undersigned is aware that some courts have held *Skilling* to be retroactive on collateral review. *See, i,e., Stayton v. United States,* — F. Supp. 2d —, 2011 WL 691238, at *4 (S.D.Ala. Feb. 28, 2011); *Rodrigues v. United States*, No. CV. No. 10-00406 DAE-KSC, slip copy, 2011 WL 529158, at *8 (D.Hawaii Jan. 31, 2011); *Ryan v. United States*, — F. Supp. 2d —, 2010 WL 5495015, at *1 (N.D.Ill. Dec. 21, 2010).

affirmed the Seventh Circuit's reversal of Santos' money laundering conviction. A four-Justice plurality (Justices Scalia, Souter, Thomas, and Ginsburg) concluded that the term "proceeds" in the money laundering statute means profits, not gross receipts. *Id.* at 510–14. It reasoned that, "[f]rom the face of the statute, there is no more reason to think that 'proceeds' means 'receipts' than there is to think that 'proceeds' means 'profits,'" and from there, applied the rule of lenity to conclude that "the tie must go to the defendant." *Id.* at 514. The plurality expressed concern that if the definition of "proceeds" were not limited to profits, a money laundering charge would "merge" with the crime of running an illegal gambling business. *See id.* at 515 ("If 'proceeds' meant 'receipts,' nearly every violation of the illegal-lottery statute would also be a violation of the money laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery."). It noted that under this reading, prosecutors would "acquire the discretion" to charge the "greater money-laundering offense" instead of or in addition to the "lesser lottery offense" in nearly every case involving an illegal lottery. *Id.* at 516. For these reasons, the plurality concluded that "proceeds" must mean "profits," regardless of the specified unlawful activity at issue.

In a concurring opinion, Justice Stevens took the position that the definition of "proceeds" might depend upon the particular specified unlawful activity underlying the money laundering charge at issue. *Id.* at 524–26 (Stevens, J., concurring). He emphasized the lack of legislative history indicating that Congress intended the term "proceeds" to mean "gross receipts" in the context of gambling offenses. *Id.* at 526. He also expressed concern about the "merger problem" identified by the plurality. *See id.* at 527 ("Allowing the Government to treat the mere payment of the expense of operating an illegal gambling business as a separate offense is in practical effect tantamount to

11

double jeopardy, which is particularly unfair in this case because the penalties for money laundering are substantially more severe than those for the underlying offense of operating a gambling business."). He nevertheless concluded that legislative history evinces Congress' intent that the money laundering statute apply to transactions involving the gross revenues, not just the profits, of certain other specified unlawful activities. *Id.* at 528 n.7 ("In other applications of the statute not involving such a perverse result, I would presume that the [dissent] reflects the intent of the enacting Congress.").

In his dissent, Justice Alito, who was joined by Chief Justice Roberts and Justices Kennedy and Breyer, stated he would have held that the term "proceeds" means "gross receipts" in all circumstances. *Id.* at 546, 128 S. Ct. 2020 (Alito, J., dissenting).

Cotton argues that *Santos* applies in the context of her convictions under § 1957 and states, without further argument or citation to authority, that "her case was a receipts case regarding checks written for expense[s] of the Company and to remove the loan proceeds from [SouthTrust Bank] because they invested it unlawful[ly]." (Pet. at 6 & Pet'r Mem. at 15) The Fifth Circuit has indicated that *Santos* may apply more broadly–*i.e.,* to other predicate offenses, and is retroactively applicable to cases on collateral review. *See Garland v. Roy*, 615 F.3d 391, 401 (5th Cir. 2010). Thus, the question arises as to whether *Santos* is applicable to Cotton's case such that the court is required to apply a profits definition of proceeds to Cottons's bank fraud and false-statements offenses.

The predicate offenses in Cotton's case are the bank fraud offenses against SouthTrust Bank, in violation of §§ 1344 and 2, and the false statements offenses, in violation of §§ 1001, 1014 and 2. To prove money laundering under former § 1957, the government had to prove that Cotton

12

knowingly engaged or attempted to engage in a monetary transaction in criminally derived property of a value greater than $10,000, and that the property was derived from specified unlawful activity. The term "monetary transaction" was defined as "the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument by, through, or to a financial institution." The term "criminally derived property" was defined as "any property constituting, or derived from, proceeds obtained from a criminal offense." As in *Santos*, the term "proceeds" was not defined.

In an effort to be thorough, the 35 counts contained in the indictment are set forth below in their entirety. In Counts 1 and 22, charging bank fraud, the indictment alleged:

(Count 1)    1. On or about November 13, 1996, in the Northern District of Georgia and elsewhere, the defendant JULIET R. COTTON, a/k/a J.R. Woodard, knowingly executed and attempted to execute a scheme and artifice to defraud and to obtain moneys, funds, and credits owned by and under the custody and control of a financial institution, SouthTrust Bank of Alabama, N.A., the deposits of which were insured by the Federal Deposit Insurance Corporation, by executing a loan agreement with SouthTrust Bank, on behalf of Quality Grain Company (Ghana), Ltd., a corporation organized under the laws of the Republic of Ghana, pursuant to which the bank agreed to make a loan available of $6,196,330, with the proceeds of the loan to be used for the purchase of rice milling equipment, agricultural implements, and equipment.

2. It was a part of the scheme and artifice that the defendant would make and cause to be made false pretenses, representations, and promises to the effect that a firm identified as "Agri-Tech," of Cordova, Tennessee, was to provide certain "project development work" and "project management and technical services, along with the technology transfer of commercial rice production, operation and management for three years of the production and processing of long-grain rice" to ensure that a project to be undertaken by Quality Grain Company (Ghana), Ltd., in the Republic of Ghana met certain standards, all as set forth in a purchase and sales agreement for management and technical services dated November 7, 1996, between Quality Grain Company (Ghana), Ltd., as the buyer, and Agri-Tech, as the seller.

3. It was a part of the scheme and artifice that the defendant would conceal from the SouthTrust Bank, the fact that Agri-Tech did not fulfill the requirements of the

13

agreement with Quality Grain Company (Ghana), Ltd., or provide the services to Quality Grain Company (Ghana), Ltd., referred to therein.

4. It is relevant to the scheme and artifice that SouthTrust Bank required that Quality Grain Company (Ghana), Ltd., obtain the issuance of an Export-Import Bank of the United States credit insurance policy as a condition to making proceeds of the loan available to Quality Grain Company (Ghana), Ltd., and that in connection with the credit insurance, the Export-Import Bank required that Quality Grain Company (Ghana), Ltd., make a 15% cash down payment to suppliers in the aggregate amount of $1,050,000.

5. As a result of the scheme and artifice, the defendant JULIET R. COTTON, a/k/a/ J.R. Woodard, induced SouthTrust Bank, N.A., to transfer to Agri-Tech more than $2,000,000 of the proceeds of the loan to Quality Grain Company (Ghana), Ltd., for the defendant's personal use and benefit.

(Count 22) 1. On or about July 22, 1997, in the Northern District of Georgia and elsewhere, the defendant JULIET R. COTTON, a/k/a J.R. Woodard, aided and abetted by others known and unknown to the Grand Jury, knowingly executed and attempted to execute a scheme and artifice to defraud and to obtain moneys, funds, and credits owned by and under the custody and control of a financial institution, SouthTrust Bank, N.A., the deposits of which were insured by the Federal Deposit Insurance Corporation, by executing a credit agreement with SouthTrust Bank on behalf of Quality Grain company (Ghana), Ltd., a corporation organized under the laws of the Republic of Ghana, pursuant to which the bank agreed to make credit available to Quality Grain Company (Ghana), Ltd., in the amount of $12,000,000, for the purchase of farm equipment and related engineering services.

2. It was a part of the scheme and artifice that the defendant would make and cause to be made false pretenses, representations, and promises to the effect that a firm identified as "Agri-Tech," of Cordova, Tennessee, was to provide engineering services for a project to be undertaken by Quality Grain Company (Ghana), Ltd., in the Republic of Ghana.

3. It was a part of the scheme and artifice that the defendant would conceal from the SouthTrust Bank, N.A., the fact that Agri-Tech did not provide any engineering services to Quality Grain Company (Ghana), Ltd.

4. As a result of the scheme and artifice, the defendant JULIET R. COTTON, a/k/a J.R. Woodard, induced SouthTrust Bank, N.A., to disburse more than $2,000,000 of the bank's money, funds, and credits for the defendant's personal use and benefit.

In Counts 2-3, 13-14, 16-17, 19-20, and 35, charging false statements under §§ 1001 and 2, the indictment alleged:

(Count 2)     On or about November 26, 1996, in the Northern District of Georgia and elsewhere, the defendant, JULIET R. COTTON, a/k/a J.R. Woodard, aided and abetted by others known and unknown to the Grand Jury, knowingly and willfully made and used and caused to be made and used a false writing and document in a matter within the jurisdiction of the Export-Import Bank of the United States, an agency of the Government of the United States, to wit:  invoice no. 893-AGRTE48 from Agri-Tech, knowing the same to contain materially false and fraudulent statements and entries, namely, that Agri-Tech was due $2,299,281.40 "reimbursement for pre-project services, Nov. 7- Nov. 13, 1996," provided to Quality Grain Company (Ghana), Ltd., by Agri-Tech.

(Count 3)     On or about November 26, 1996, in the Northern District of Georgia and elsewhere, the defendant, JULIET R. COTTON, a/k/a J.R. Woodard, aided and abetted by others known and unknown to the Grand Jury, knowingly and willfully made and used and caused to be made and used a false writing and document in a matter within the jurisdiction of the Export-Import Bank of the United States, an agency of the Government of the United States, to wit:  an Export-Import Bank Exporter's Certificate, knowing the same to contain materially false and fraudulent statements and entries, namely, that "operations, management, and technology transfer services" had been provided to Quality Grain Company (Ghana), Ltd. by Agri-Tech at a contract price of $2,299,281.40 to Quality Grain Company (Ghana), Ltd., and that Quality Grain Company (Ghana), Ltd. had made a cash payment to Agri-Tech with respect to such services in the amount of $344,892.00.

(Count 13)    On or about January 28, 1977, in the Northern District of Georgia and elsewhere, the defendant, JULIET R. COTTON, a/k/a J.R. Woodard, aided and abetted by others known and unknown to the Grand Jury, knowingly and willfully made and used and caused to be made and used a false writing and document in a matter within the jurisdiction of the Export-Import Bank of the United States, an agency of the Government of the United States, to wit:  an invoice No. 894-AGRTE48 from Agri-Tech dated January 8, 1997, knowing the same to contain materially false and fraudulent statements and entries, namely, that certain "services" had been rendered and executed for Quality Grain Company (Ghana), Ltd., by Agri-Tech, and that the sum of $1,000,000, was due to Agri-Tech for such services.

(Count 14)    On or about January 28, 1977, in the Northern District of Georgia and elsewhere, the defendant, JULIET R. COTTON, a/k/a J.R. Woodard, aided and abetted by others known and unknown to the Grand Jury, knowingly and willfully made and used and caused to be made and used a false writing and document in a matter within the

15

jurisdiction of the Export-Import Bank of the United States, an agency of the Government of the United States, to wit: an Export-Import Bank Exporter's Certificate, knowing the same to contain materially false and fraudulent statements and entries, namely, that "operations, management, and technology transfer services" had been provided to Quality Grain Company (Ghana), Ltd., by Agri-Tech at a contract price to Quality Grain Company (Ghana), Ltd., had made a $150,000 cash payment to Agri-Tech with respect to such services.

(Count 16)    On or about March 27, 1977, in the Northern District of Georgia and elsewhere, the defendant, JULIET R. COTTON, a/k/a J.R. Woodard, aided and abetted by others known and unknown to the Grand Jury, knowingly and willfully made and used and caused to be made and used a false writing and document in a matter within the jurisdiction of the Export-Import Bank of the United States, an agency of the Government of the United States, to wit: invoice no. 269-AGRTE49 from Agri-Tech dated March 8, 1997, knowing the same to contain materially false and fraudulent statements and entries, namely, that Agri-Tech was due $120,000 for "project management services" delivered to Quality Grain Company (Ghana), Ltd., by Agri-Tech.

(Count 17)    On or about March 27, 1977, in the Northern District of Georgia and elsewhere, the defendant, JULIET R. COTTON, a/k/a J.R. Woodard, aided and abetted by others known and unknown to the Grand Jury, knowingly and willfully made and used and caused to be made and used a false writing and document in a matter within the jurisdiction of the Export-Import Bank of the United States, an agency of the Government of the United States, to wit: an Export-Import Bank Exporter's Certificate, knowing the same to contain materially false and fraudulent statements and entries, namely, that "operations, management, and technology transfer services" had been provided to Quality Grain Company (Ghana), Ltd., by Agri-Tech at a contract price of $120,000 to Quality Grain Company (Ghana), Ltd., and that Quality Grain company (Ghana), Ltd. had made a cash payment to Agri-Tech with respect to such services in the amount of $18,000.

(Count 19)    On or about July 3, 1977, in the Northern District of Georgia and elsewhere, the defendant, JULIET R. COTTON, a/k/a J.R. Woodard, aided and abetted by others known and unknown to the Grand Jury, knowingly and willfully made and used and caused to be made and used a false writing and document in a matter within the jurisdiction of the Export-Import Bank of the United States, an agency of the Government of the United States, to wit: invoice no. 340QGCCI/258-A from Agri-Tech dated May 11, 1997, knowing the same to contain materially false and fraudulent statements and entries, namely, that Agri-Tech was due $157,548.21 for "construction, testing and certification of the rice mill and drying system" services provided by Agri-Tech to Quality Grain Company (Ghana), Ltd.

(Count 20)    On or about July 3, 1977, in the Northern District of Georgia and elsewhere, the defendant, JULIET R. COTTON, a/k/a J.R. Woodard, aided and abetted by others known and unknown to the Grand Jury, knowingly and willfully made and used and caused to be made and used a false writing and document in a matter within the jurisdiction of the Export-Import Bank of the United States, an agency of the Government of the United States, to wit:  an Export-Import Bank Exporter's Certificate, knowing the same to contain materially false and fraudulent statements and entries, namely, that "operations, management, and technology transfer services" had been provided to Quality Grain Company (Ghana), Ltd., by Agri-Tech at a contract price of $157,584.21 to Quality Grain Company (Ghana), Ltd., and that Quality Grain company (Ghana), Ltd. had made a cash payment to Agri-Tech with respect to such services in the amount of $23,637.63.

(Count 35)    On or about July 13, 2001, in the Northern District of Georgia and elsewhere, the defendant, JULIET R. COTTON, a/k/a J.R. Woodard, aided and abetted by others known and unknown to the Grand Jury, knowingly and willfully made and used and caused to be made and used a false writing and document in a matter within the jurisdiction of the Export-Import Bank of the United States, an agency of the Government of the United States, to wit:  a Notice of Claim and Proof of Loss by SouthTrust Bank, N.A., in the amount of $2,061,527, under Export-Import Bank credit insurance policy; MSM-E-172510, that enclosed copies of Agri-Tech invoices nos. 893-AGRTE48, and 894-AGRTE48, Agri-Tech Exporter's Certificates dated November 26, 1996, and January 8, 1997; and a "Purchase and Sales Agreement for Management and Technical Services," between Agri-Tech and Quality Grain Company (Ghana), Ltd., dated November 7, 1996, which contained materially false statements and entries, knowing the same to contain the materially false and fraudulent statements and entries, to with: that Agri-Tech had provided the services to Quality Grain Company (Ghana), Ltd., and that Quality Grain Company (Ghana), Ltd., had made cash payments to Agri-Tech with respect to such services, all as set forth therein.

In Counts 4, 15, 18, 21, 23, and 30, charging false statements on a loan or credit application

under §§ 1014 and 2, the indictment alleged:

(Count 4)    On or about November 26, 1996, in the Northern District of Georgia and elsewhere, the defendant, JULIET R. COTTON, a/k/a J.R. Woodard, aided and abetted by others known and unknown to the Grand Jury, knowingly made and caused to be made false statements for the purpose of influencing the action of SouthTrust Bank of Alabama, N.A., a financial institution the deposits of which were insured by the Federal Deposit Insurance Corporation, upon an advance under a loan agreement dated November 13, 1996, that is, the defendant submitted and caused to be submitted to SouthTrust Bank of Alabama, Atlanta International Office, an

Exporter's Certificate and a commercial invoice from Agri-Tech, as required by the loan agreement between SouthTrust Bank and Quality Grain company (Ghana), Ltd., for the purpose of influencing the action of the bank in making proceeds of the loan available to Quality Grain Company (Ghana), Ltd., in the amount of $1,954,389.32, which falsely stated that Agri-Tech had completed services for Quality Grain Company (Ghana), Ltd., for which Quality Grain Company (Ghana), Ltd., had made a cash payment of $344,892 to Agri-Tech, when in truth and in fact, as the defendant then well knew, Agri-Tech had not completed any services for Quality Grain Company (Ghana), Ltd., and had not received a $344,892 cash payment for any services.

(Count 15)    On or about January 28, 1997, in the Northern District of Georgia and elsewhere, the defendant, JULIET R. COTTON, a/k/a J.R. Woodard, knowingly made and caused to be made false statements for the purpose of influencing the action of SouthTrust Bank of Alabama, N.A., a financial institution the deposits of which were insured by the Federal Deposit Insurance Corporation, upon an advance under a loan agreement dated November 13, 1996, that is, the defendant submitted and caused to be submitted to SouthTrust Bank of Alabama, Atlanta International Office, an Exporter's Certificate and a commercial invoice from Agri-Tech, as required by the loan agreement between SouthTrust Bank and Quality Grain company (Ghana), Ltd., for the purpose of influencing the action of the bank in making proceeds of the loan available to Quality Grain Company (Ghana), Ltd., in the amount of $850,000, which documents falsely stated that Agri-Tech had completed "operations, management, and technology transfer services" for Quality Grain Company (Ghana), Ltd., when in truth and in fact, as the defendant then well knew, Agri-Tech had not completed any services for Quality Grain Company (Ghana), Ltd.

(Count 18)    On or about March 27, 1997, in the Northern District of Georgia and elsewhere, the defendant, JULIET R. COTTON, a/k/a J.R. Woodard, aided and abetted by others known and unknown to the Grand Jury, knowingly made and caused to be made false statements for the purpose of influencing the action of SouthTrust Bank of Alabama, N.A., a financial institution the deposits of which were insured by the Federal Deposit Insurance Corporation, upon an advance under a loan agreement dated November 13, 1996, that is, the defendant submitted and caused to be submitted to SouthTrust Bank of Alabama, Atlanta International Office, an Exporter's Certificate and a commercial invoice from Agri-Tech, as required by the loan agreement between SouthTrust Bank and Quality Grain company (Ghana), Ltd., for the purpose of influencing the action of the bank in making proceeds of the loan available to Quality Grain Company (Ghana), Ltd., in the amount of $120,000, which falsely stated that Agri-Tech had completed "operations, management, and technology services" for Quality Grain Company (Ghana), Ltd., for which Agri-Tech had been paid $18,000 in cash by Quality Grain Company (Ghana), Ltd., when in

truth and in fact, as the defendant then well knew, Agri-Tech had not completed any services for Quality Grain Company (Ghana), Ltd.

(Count 21)   On or about July 3, 1997, in the Northern District of Georgia and elsewhere, the defendant, JULIET R. COTTON, a/k/a J.R. Woodard, aided and abetted by others known and unknown to the Grand Jury, knowingly made and caused to be made false statements for the purpose of influencing the action of SouthTrust Bank of Alabama, N.A., a financial institution the deposits of which were insured by the Federal Deposit Insurance Corporation, upon an advance under a loan agreement dated November 13, 1996, that is, the defendant submitted and caused to be submitted to SouthTrust Bank of Alabama, Atlanta International Office, an Exporter's Certificate and a commercial invoice from Agri-Tech, as required by the loan agreement between SouthTrust Bank and Quality Grain company (Ghana), Ltd., for the purpose of influencing the action of the bank in making proceeds of the loan available to Quality Grain Company (Ghana), Ltd., in the amount of $157,584.21, which documents falsely stated that Agri-Tech had completed "operations, management, and technology transfer services" for Quality Grain Company (Ghana), Ltd., for which Agri-Tech had been paid $23,637.63 in cash by Quality Grain Company (Ghana), Ltd., when in truth and in fact, as the defendant then well knew, Agri-Tech had not completed any services for Quality Grain Company (Ghana), Ltd.

(Count 23)   On or about August 7, 1997, in the Northern District of Georgia and elsewhere, the defendant, JULIET R. COTTON, a/k/a J.R. Woodard, aided and abetted by others known and unknown to the Grand Jury, knowingly made and caused to be made false statements for the purpose of influencing the action of SouthTrust Bank of Alabama, N.A., a financial institution the deposits of which were insured by the Federal Deposit Insurance Corporation, upon an application and agreement for the issuance and payment of a commercial letter of credit made by Quality Grain Company (Ghana), Ltd., that is, the defendant submitted and caused to be submitted to SouthTrust Bank, N.A., Atlanta International Office, an invoice from Agri-Tech dated April 8, 1997, for the purpose of influencing the action of the bank in making available and paying a letter of credit in the amount of $2,215,000, for Quality Grain Company (Ghana), Ltd., to the benefit of Agri-Tech, which invoice falsely stated that Agri-Tech had provided the services specified in the invoice to Quality Grain Company (Ghana), Ltd., when in truth and in fact, as the defendant then well knew, Agri-Tech had not completed any services for Quality Grain Company (Ghana), Ltd.

(Count 30)   On or about September 23, 1997, in the Northern District of Georgia and elsewhere, the defendant, JULIET R. COTTON, a/k/a J.R. Woodard, aided and abetted by others known and unknown to the Grand Jury, knowingly made and caused to be made false statements for the purpose of influencing the action of SouthTrust Bank of Alabama, N.A., a financial institution the deposits of which were insured by the Federal Deposit Insurance Corporation, upon an application and agreement for the

issuance and payment of a commercial letter of credit made by Quality Grain Company (Ghana), Ltd., that is, the defendant submitted and caused to be submitted to SouthTrust Bank, N.A., Atlanta International Office, two invoices from Agri-Tech dated April 8, 1997, for the purpose of influencing the action of the bank in making available and paying a letter of credit for Quality Grain Company (Ghana), Ltd., to the benefit of Agri-Tech in the amount of $4,943,715, which invoices falsely stated that Agri-Tech had provided the services specified in the invoices to Quality Grain Company (Ghana), Ltd., when in truth and in fact, as the defendant then well knew, Agri-Tech had not completed any services for Quality Grain Company (Ghana), Ltd.

Finally, in Counts 5-12, 24-29, and 31-34, charging money laundering, the indictment alleged:

(Count 5)     On or about December 1, 1996, in the Northern District of Georgia and elsewhere, the defendant JULIET R. COTTON, a/k/a J.R. Woodard, aided and abetted by others unknown to the Grand Jury, knowing engaged and attempted to engage in a monetary transaction in criminally derived property that was of a value greater than $10,000, in and affecting interstate commerce, to wit: a transfer of a monetary instrument, that is, a check payable to "Gospel Tabernacle Church," drawn on the account of Quality Grain Company Inc., at First Tennessee Bank, N.A., Memphis, Tennessee, in the amount of $22,000, which was derived from specified unlawful activity, namely, acts and activities constituting an offense under Title 18, United States Code, Section 1014, and Section 1344, to a person known to the Grand Jury but not named herein, for payment, transfer, and delivery by, through, and to First Southern Bank, Atlanta, Georgia, and First Tennessee Bank, N.A.

(Count 6)     On or about December 1, 1996, in the Northern District of Georgia and elsewhere, the defendant JULIET R. COTTON, a/k/a J.R. Woodard, aided and abetted by others unknown to the Grand Jury, knowing engaged and attempted to engage in a monetary transaction in criminally derived property that was of a value greater than $10,000, in and affecting interstate commerce, to wit: a transfer of a monetary instrument, that is, a check payable to "Gospel Tabernacle Church," drawn on the account of Quality Grain Company Inc., at First Tennessee Bank, N.A., Memphis, Tennessee, in the amount of $50,000, which was derived from specified unlawful activity, namely, acts and activities constituting an offense under Title 18, United States Code, Section 1014, and Section 1344, to a person known to the Grand Jury but not named herein, for payment, transfer, and delivery by, through, and to Citizens Trust Bank, Atlanta, Georgia, and First Tennessee Bank, N.A.

(Count 7)     On or about December 1, 1996, in the Northern District of Georgia and elsewhere, the defendant JULIET R. COTTON, a/k/a J.R. Woodard, aided and abetted by others unknown to the Grand Jury, knowing engaged and attempted to engage in a monetary

transaction in criminally derived property that was of a value greater than $10,000, in and affecting interstate commerce, to wit: a transfer of a monetary instrument, that is, a check payable to "Gospel Tabernacle Church," drawn on the account of Quality Grain Company Inc., at First Tennessee Bank, N.A., Memphis, Tennessee, in the amount of $50,000, which was derived from specified unlawful activity, namely, acts and activities constituting an offense under Title 18, United States Code, Section 1014, and Section 1344, to a person known to the Grand Jury but not named herein, for payment, transfer, and delivery by, through, and to Citizens Trust Bank, Atlanta, Georgia, and First Tennessee Bank, N.A.

(Count 8)    On or about December 2, 1996, in the Northern District of Georgia and elsewhere, the defendant JULIET R. COTTON, a/k/a J.R. Woodard, aided and abetted by others unknown to the Grand Jury, knowingly engaged and attempted to engage in a monetary transaction in criminally derived property that was of a value greater than $10,000, in and affecting interstate commerce, which was derived from specified unlawful activity, namely, acts and activities constituting an offense under Title 18, United States Code Section 1014, and Section 1344, to wit: a transfer of funds by wire in the amount of $650,000 from the account of Quality Grain Company Inc., a corporation organized in the United States, at First Tennessee Bank, N.A., Memphis, Tennessee, to the account of Juliet R. Woodard, at Wachovia Bank, N.A., Atlanta, Georgia.

(Count 9)    On or about December 5, 1996, in the Northern District of Georgia and elsewhere, the defendant JULIET R. COTTON, a/k/a J.R. Woodard, aided and abetted by others unknown to the Grand Jury, knowingly engaged and attempted to engage in a monetary transaction in criminally derived property that was of a value greater than $10,000, in affecting interstate commerce, which was derived from specified unlawful activity, namely, acts and activities constituting an offense under Title 18, United States Code Section 1014, and Section 1344, to wit: a transfer of funds by wire in the amount of $1,050,000 from the account of Quality Grain Company Inc., at First Tennessee Bank, N.A., Memphis, Tennessee, to the account of Quality Grain Company Inc., at SouthTrust Bank, N.A., Atlanta, Georgia.

(Count 10)   On or about December 10, 1996, in the Northern District of Georgia and elsewhere, the defendant JULIET R. COTTON, a/k/a J.R. Woodard, aided and abetted by others unknown to the Grand Jury, knowingly engaged and attempted to engage in a monetary transaction in criminally derived property that was of a value greater than $10,000, in and affecting interstate commerce, which was derived from specified unlawful activity, namely, acts and activities constituting an offense under Title 18, United States Code Section 1014, and Section 1344, to wit: a transfer of funds by a "debit memo" in the amount of $1,050,000 from the account of Quality Grain Company Inc., at SouthTrust Bank, N.A., Atlanta, Georgia, to a "cash items-international" account at SouthTrust Bank N.A.

(Count 11)    On or about December 10, 1996, in the Northern District of Georgia and elsewhere, the defendant JULIET R. COTTON, a/k/a J.R. Woodard, aided and abetted by others unknown to the Grand Jury, knowingly engaged and attempted to engage in a monetary transaction in criminally derived property that was of a value greater than $10,000, in and affecting interstate commerce, which was derived from specified unlawful activity, namely, acts and activities constituting an offense under Title 18, United States Code Section 1014, and Section 1344, to wit: a withdrawal of funds by a bank check payable to "Juliet Renee Woodard," in the amount of $540,000, from Wachovia Bank, N.A., Atlanta, Georgia.

(Count 12)    On or about December 12, 1996, in the Northern District of Georgia and elsewhere, the defendant JULIET R. COTTON, a/k/a J.R. Woodard, aided and abetted by others unknown to the Grand Jury, knowingly engaged and attempted to engage in a monetary transaction in criminally derived property that was of a value greater than $10,000, in and affecting interstate commerce, which was derived from specified unlawful activity, namely, acts and activities constituting an offense under Title 18, United States Code Section 1014, and Section 1344, to wit: a transfer of a monetary instrument, that is, a bank check payable to "Juliet Renee Woodard," drawn on Wachovia Bank, N.A., in the amount of $540,000, to a person known to the Grand Jury but not named herein, for payment, transfer, and delivery by, through, to, Regions Bank, Atlanta, Georgia, and Wachovia Bank, N.A.

(Count 24)    On or about August 9, 1997, in the Northern District of Georgia and elsewhere, the defendant JULIET R. COTTON, a/k/a J.R. Woodard, aided and abetted by others known and unknown to the Grand Jury, knowingly engaged and attempted to engage in a monetary transaction in criminally derived property that was of a value greater than $10,000, in and affecting interstate commerce, which was derived from specified unlawful activity, namely, acts and activities constituting an offense under Title 18, United States Code Section 1014, and Section 1344, to wit: a transfer of a monetary instrument, that is, currency of the United States in the amount of $65,152.30, to a person known to the Grand Jury but not named herein, for deposit at Nations Bank, N.A., Atlanta, Georgia.

(Count 25)    On or about August 11, 1997, in the Northern District of Georgia and elsewhere, the defendant JULIET R. COTTON, a/k/a J.R. Woodard, aided and abetted by others known and unknown to the Grand Jury, knowingly engaged and attempted to engage in a monetary transaction in criminally derived property that was of a value greater than $10,000, in and affecting interstate commerce, which was derived from specified unlawful activity, namely, acts and activities constituting an offense under Title 18, United States Code Section 1014, and Section 1344, to wit: a transfer of a monetary instrument, that is, currency of the United States in the amount of $30,000, to a person known to the Grand Jury but not named herein, for deposit at SunTrust Bank, Atlanta, Georgia.

(Count 26)     On or about August 26, 1997, in the Northern District of Georgia and elsewhere, the defendant JULIET R. COTTON, a/k/a J.R. Woodard, aided and abetted by others known and unknown to the Grand Jury, knowingly engaged and attempted to engage in a monetary transaction in criminally derived property that was of a value greater than $10,000, in and affecting interstate commerce, which was derived from specified unlawful activity, namely, acts and activities constituting an offense under Title 18, United States Code Section 1014, and Section 1344, to wit: a transfer of funds by wire [in] the amount of $50,000 from the account of Quality Grain Company, Inc., at SouthTrust Bank, N.A., Atlanta, Georgia, to the account of Juliet Woodard, at Wachovia Bank, N.A., Atlanta, Georgia.

(Count 27)     On or about August 26, 1997, in the Northern District of Georgia and elsewhere, the defendant JULIET R. COTTON, a/k/a J.R. Woodard, aided and abetted by others known and unknown to the Grand Jury, knowingly engaged and attempted to engage in a monetary transaction in criminally derived property that was of a value greater than $10,000, in and affecting interstate commerce, which was derived from specified unlawful activity, namely, acts and activities constituting an offense under Title 18, United States Code Section 1014, and Section 1344, to wit: a transfer of funds by wire in the amount of $100,000 from the account of Quality Grain Company, Inc., at SouthTrust Bank, N.A., Atlanta, Georgia, to the account of Quality Grain Company, Inc., at First Tennessee Bank, N.A., Memphis, Tennessee.

(Count 28)     On or about August 27, 1997, in the Northern District of Georgia and elsewhere, the defendant JULIET R. COTTON, a/k/a J.R. Woodard, aided and abetted by others known and unknown to the Grand Jury, knowingly engaged and attempted to engage in a monetary transaction in criminally derived property that was of a value greater than $10,000, in and affecting interstate commerce, which was derived from specified unlawful activity, namely, acts and activities constituting an offense under Title 18, United States Code Section 1014, and Section 1344, to wit: a transfer of funds by wire in the amount of $79,000 from the account of Quality Grain Company, Inc., at SouthTrust Bank, N.A., Atlanta, Georgia, to the account of Mary L. Woodard or Bretha G. Woodard, at Senatobia Bank, Senatobia, Mississippi.

(Count 29)     On or about August 27, 1997, in the Northern District of Georgia and elsewhere, the defendant JULIET R. COTTON, a/k/a J.R. Woodard, aided and abetted by others known and unknown to the Grand Jury, knowingly engaged and attempted to engage in a monetary transaction in criminally derived property that was of a value greater than $10,000, in and affecting interstate commerce, which was derived from specified unlawful activity, namely, acts and activities constituting an offense under Title 18, United States Code Section 1014, and Section 1344, to wit: a transfer of funds by wire in the amount of $100,000 from the account of Quality Grain Company, Inc., at SouthTrust Bank, N.A., Atlanta, Georgia, to the account of Juliet Woodard, at Wachovia Bank, N.A., Atlanta, Georgia.

(Count 31)    On or about October 17, 1997, in the Northern District of Georgia and elsewhere, the defendant JULIET R. COTTON, a/k/a J.R. Woodard, aided and abetted by others known and unknown to the Grand Jury, knowingly engaged and attempted to engage in a monetary transaction in criminally derived property that was of a value greater than $10,000, in and affecting interstate commerce, which was derived from specified unlawful activity, namely, acts and activities constituting an offense under Title 18, United States Code Section 1014, and Section 1344, to wit: a transfer of funds by wire in the amount of $26,000 from the account of Quality Grain Company, Inc., at SouthTrust Bank, N.A., Atlanta, Georgia, to the account of Jack and Ceatrice Cotton, at Commercial Federal Savings, Omaha, Nebraska.

(Count 32)    On or about October 17, 1997, in the Northern District of Georgia and elsewhere, the defendant JULIET R. COTTON, a/k/a J.R. Woodard, aided and abetted by others known and unknown to the Grand Jury, knowingly engaged and attempted to engage in a monetary transaction in criminally derived property that was of a value greater than $10,000, in and affecting interstate commerce, which was derived from specified unlawful activity, namely, acts and activities constituting an offense under Title 18, United States Code Section 1014, and Section 1344, to wit: a transfer of funds by wire in the amount of $500,000 from the account of Quality Grain Company, Inc., at SouthTrust Bank, N.A., Atlanta, Georgia, to the account of Quality Grain Company Inc., at First Tennessee Bank, N.A., Memphis, Tennessee.

(Count 33)    On or about November 26, 1997, in the Northern District of Georgia and elsewhere, the defendant JULIET R. COTTON, a/k/a J.R. Woodard, aided and abetted by others known and unknown to the Grand Jury, knowingly engaged and attempted to engage in a monetary transaction in criminally derived property that was of a value greater than $10,000, in and affecting interstate commerce, which was derived from specified unlawful activity, namely, acts and activities constituting an offense under Title 18, United States Code Section 1014, and Section 1344, to wit: a transfer of a monetary instrument, that is, a check payable to "Troncalli Jaguar," drawn on the account of Quality Grain Company, Inc., First Tennessee Bank, N.A., Memphis, Tennessee, in the amount of $59,598.35, which was derived from specified unlawful activity, namely, acts and activities constituting an offense under Title 18, United States Code, Section 1014, and Section 1344, to a person known to the Grand Jury but not named herein, for payment, transfer, and delivery by, and through, and to SunTrust Bank, Atlanta, Georgia, and first Tennessee Bank, N.A., Memphis, Tennessee.

(Count 34)    On or about December 15, 1997, in the Northern District of Georgia and elsewhere, the defendant JULIET R. COTTON, a/k/a J.R. Woodard, aided and abetted by others known and unknown to the Grand Jury, knowingly engaged and attempted to engage in a monetary transaction in criminally derived property that was of a value greater than $10,000, in and affecting interstate commerce, which was derived from

specified unlawful activity, namely, acts and activities constituting an offense under Title 18, United States Code Section 1014, and Section 1344, to wit: a transfer of a monetary instrument, that is, a check payable to "Juliet Woodard," drawn on the account of Quality Grain Company, Inc., at First Tennessee Bank, N.A., Memphis, Tennessee, in the amount of $3,300,000, which was derived from specified unlawful activity, namely, acts and activities constituting an offense under Title 18, United States Code, Section 1014, and Section 1344, for payment, transfer, and delivery by, through, and to SunTrust Bank, Atlanta, Georgia, and First Tennessee Bank, N.A.

(Pet., Attach. "Indictment" at 1-29)

Assuming, without deciding, that *Santos* applies to § 1957, Cotton fails to explain how the transactions charged as money laundering were "essential expenses," and not profits, of the bank frauds and false-statements offenses. *See Abuhouran v. Grondolsky*, 643 F. Supp. 2d 654, 659-73 (D.N.J. 2009), *cert. denied*, 131 S. Ct. 1624 (2011). *Compare Garland*, 615 F.3d at 395 (where defendant took "proceeds" from his criminal activities and used it to maintain the criminal enterprise). The bank fraud and false-statements offenses were defined by the obtaining of money fraudulently, while the money laundering charges were defined by transferring the proceeds thereafter for purposes other than the expenses of the frauds. In other words, Cotton has not demonstrated that the same transaction was used to prove both the underlying unlawful activity and the money-launderying charges. *Garland*, 615 F.3d at 404. Instead, Cotton made the transfers, the transactions of money laundering, with money she knew was the result of bank fraud and fraudulent statements after the predicate offenses were complete. Thus, the "merger problem" never arises in the circumstances of this case, and *Santos* does not require the court to apply the narrower profits definition of "proceeds." *See United States v. Halstead*, 634 F.3d 270, 280 (4th Cir. 2011). Accordingly, Cotton is not actually innocent of money laundering under *Santos* and the court need not exercise jurisdiction pursuant to 28 U.S.C. § 2241.

25

## II. RECOMMENDATION

Based on the foregoing, it is recommended that the government's motion to dismiss be granted for lack of jurisdiction as to all claims.

### III. NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 10 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The court is extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions, and recommendation until May 16, 2011. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

### IV. ORDER

Under 28 U.S.C. § 636, it is ordered that each party is granted until May 16, 2011, to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions, and recommendation. It is further ordered that if objections are filed and the opposing party chooses

to file a response, a response shall be filed within seven (7) days of the filing date of the objections.

It is further ordered that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions, and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED April ___25___, 2011.


_____
JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE